_____

JARVIS ELDER,

                        Plaintiff,

                                                DECISION AND ORDER

-vs-

                                                14-CV-6216 CJS

J. McCARTHY, Sergeant, T. MacINTYRE,
Corrections Officer, KEN KLING, Hearing Officer/
Voc. Supr., ALBERT PRACK, Dir. of Special
Housing, and MARK L. BRADT, Superintendent,

                                      Defendants.

_____

## INTRODUCTION

This is an action under 42 U.S.C. § 1983 brought by Jarvis Elder ("Plaintiff"), a prison inmate in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS").  Now before the Court are Plaintiff's motion for summary judgment (Docket No. [#80]) and Defendants' cross-motion for summary judgment [#82].  Plaintiff's application is denied, Defendants' application is granted in part, and this action is dismissed.

## BACKGROUND

Unless otherwise noted, the following are the undisputed facts of this case.  In September 2012, Plaintiff was housed at Attica Correctional Facility ("Attica"), where Defendant J. McCarthy ("McCarthy") was a Corrections Sergeant, Defendant T. MacIntyre ("MacIntyre") was a Corrections Officer, Defendant Ken Kling ("Kling") was a Vocational Supervisor and Hearing Officer, and Defendant Mark Bradt ("Bradt") was Superintendent.

On September 11, 2012, McCarthy issued Plaintiff a misbehavior report, charging him with two infractions: "forgery" and "stealing." The misbehavior report indicated that a week earlier, on September 4, 2012, an inmate named Reginald Lawrence ("Lawrence") had complained to McCarthy that someone had, on multiple occasions, stolen funds from his inmate account by forging his signature on disbursement request forms. While investigating that claim, McCarthy obtained copies of seven forged disbursement forms, which had been used to debit a total of $630 from Lawrence's account, as well as other documents relating to payments that were made after the disbursement forms were processed.[1] Although some portions of the disbursement forms are not legible, it appears that Lawrence's name is misspelled as "Lawerance" on all of them, though Lawrence's inmate identification number is correctly set forth.

Pursuant to facility rules, the disbursement forms bore not only Lawrence's purported signature, but were also purportedly countersigned or initialed by corrections officers who had verified that Lawrence was the person submitting the disbursement form.

All seven of the forged disbursement forms directed that payment be made to the same person: "Chris Brinson." Plaintiff admits that he knows "a few Chris Brinsons," but contends that they do not spell their last names exactly as set forth on the disbursement forms.[2] McCarthy also obtained a copy of a cleared check that had been issued by Attica, pursuant to one of the forged disbursement forms, directing funds from Lawrence's

---

[1]McCarthy Affidavit at ¶ ¶ 6-8 & Ex. A.
[2]Pl. Dep. at pp. 63-64. After initially indicating that he knew "a few Chris Brinsons," Plaintiff apparently changed his testimony, stating, "I know an Arthur Chris Brinson, but not no just straight Chris Brinson." *Id.* at p. 64.

account to be paid to "Chris Brinson." The back of the check was endorsed by two people: "Chris Brinson" and "Winifred Pike." Winifred Pike happens to be the name of Plaintiff's mother.[3]

The same day that Lawrence complained to McCarthy about the forgeries, a fire destroyed the contents of Plaintiff's cell, which was located near Lawrence's cell. Later that day, McCarthy received confidential information that Lawrence was "involved in possible drug activity," and that he had set the fire in Plaintiff's cell. McCarthy searched Lawrence's cell and discovered items of property belonging to Plaintiff, including an address list, a phone list, and three disbursement forms bearing Plaintiff's name. Two of the disbursement forms directed payment to "W. Pike," and the reader will recall that "Winifred Pike" is both the name of Plaintiff's mother and one of the names endorsed on the check drawn on Lawrence's inmate account.

The following day, September 5, 2012, McCarthy showed Plaintiff the documents that he had found in Lawrence's cell. Plaintiff indicated that the documents were his, and that it was his handwriting on the disbursement forms. Plaintiff told McCarthy that he did not know how his papers had ended up in Lawrence's possession.

McCarthy then noticed that the handwriting on Plaintiff's disbursement forms was similar to the writing on the forged disbursement forms that had been used to debit Lawrence's account. Based upon the similarity of the handwriting, McCarthy charged Plaintiff with forgery and stealing.

---

[3]Pl. Deposition at pp. 29, 61. At his deposition, Plaintiff was asked if the "Winifred Pike" signature on the check belonged to his mother, but he indicated that he was not familiar with his mother's signature. *Id.* at 103.

Upon being charged with these disciplinary infractions, Plaintiff was placed in keeplock (confined to a cell) in a different cell block while awaiting a Tier 3 disciplinary hearing. Consequently, defendant MacIntyre was assigned to act as Plaintiff's assistant to help him prepare for the hearing, pursuant to 7 N.Y.C.R.R. § § 251-4 & 253.4. Plaintiff maintains that he asked MacIntyre to do the following things to prepare for the hearing: 1) arrange to have the officers who verified the signatures on the allegedly-forged disbursement forms present at the hearing; 2) arrange to have a handwriting specialist compare Plaintiff's handwriting to the handwriting on the allegedly-forged disbursement forms; 3) provide a copy of "Chapter V," apparently referring to 7 N.Y.C.R.R., Chapter V, which concerns, *inter alia*, procedures for disciplinary hearings;[4] 4) arrange to have Sergeant McCarthy present at the hearing; 5) arrange to have inmate Lawrence testify at the hearing; 6) provide a copy of the "forgery directive"; and 7) provide copies of the allegedly-forged disbursement forms. Plaintiff contends that MacIntyre returned after about twenty minutes and told him that he was unable to identify the officers who had verified the disbursement form signatures; that Lawrence was unwilling to testify; that Plaintiff had to wait until the hearing to see copies of the allegedly-forged documents; that there was no directive concerning forgery; and that Plaintiff would need to arrange with the hearing officer to have McCarthy testify. MacIntyre also apparently did not give Plaintiff a copy of "Chapter V," though the Amended Complaint suggests that MacIntyre understood Plaintiff to be requesting a "directive" concerning Chapter V, which does not exist.[5]

---

[4]*See*, Pl. Dep. at p. 44.
[5]Amended Complaint ¶ 23.

4

On September 14, 2012, Plaintiff appeared for his disciplinary hearing before Kling. Kling reviewed with Plaintiff the charges against him and the documentary evidence supporting the misbehavior report.[6] In that regard, Plaintiff contends that Kling displayed the allegedly-forged disbursement forms to him, but did not allow him to personally handle them.[7] Plaintiff acknowledged that he had been served with a copy of the misbehavior report, and pleaded not guilty to both charges. Kling also reviewed with Plaintiff some of the requests that he had made to MacIntyre, which had been written on an "assistant form" that MacIntyre had filled out, and which Plaintiff had signed. Kling reiterated that inmate Lawrence was unwilling to testify. Plaintiff asked Kling if Lawrence had given a reason for his unwillingness to testify, and Kling responded, "[A]ll he wrote [is that he] does not want to testify."[8] Kling stated that he could not force Lawrence to testify. Kling further told Plaintiff that he would need to be "more specific" about the corrections officers that he wanted to have testify, since he could not identify the officers who had signed the forged disbursement forms by their handwriting, which was illegible.[9] Plaintiff agreed that the signatures were illegible.[10] Plaintiff complained that MacIntyre had not given him copies of the "evidence against him," apparently referring to copies of the forged disbursement forms. Kling did not specifically respond to that statement, although, as already noted, he had already displayed the forms to Plaintiff. Kling then adjourned the

---

[6]Hearing Transcript at pp. 3-4 (In response to Plaintiff's objection, Kling indicated that at that moment he was placing on the record the charges against Plaintiff and the evidence, and that he would consider Plaintiff's objections when he began taking testimony: "Kling: . . . [T]his is just a matter of putting the charges into the record along with the evidence. Um the – in Lawrence['s] cell are included [sic] in the evidence right here is the outside of the envelope the disbursement form the address list and — then the 7 pages of disbursement – of inmate Lawrence['s] name these were the one that were under investigation then 2 mail receipts and the back of a check and part of a check made out to Chris Brunson[.] [sic]").
[7]Pl. Dep. at pp. 49, 62.
[8]Hearing Transcript at p. 2.
[9]Hearing Transcript at p. 2.
[10]Hearing Transcript at p. 4.

hearing because McCarthy was unable to testify that day.

On September 21, 2012, Kling resumed the hearing. Kling began by reviewing what had already occurred during the hearing, and then asked Plaintiff if he wanted to testify. Plaintiff testified, in pertinent part, that he "did not steal" anything from Lawrence and did not forge the disbursement forms. [11] Plaintiff also stated that he did not know how his personal papers had ended up in Lawrence's cell, and he speculated that Lawrence might have "t[aken] some of [his] stuff out of [his] cell and made it look like [his] handwriting." Plaintiff further indicated that he could not have forged the forms because corrections officers were required to verify the signatures of the persons submitting the forms. Plaintiff also suggested that Lawrence was "trying to pull a scam to get money."

Plaintiff acknowledged that he had some type of relationship with Lawrence involving money, but he was extremely vague about the details. Plaintiff repeatedly referred to Lawrence as "the kid," which seems odd, since, according to DOCCS records, Lawrence is almost nine years older than Plaintiff.[12] In any event, Plaintiff stated that he had become acquainted with Lawrence and had "helped him out." Plaintiff stated that Lawrence "had some money coming in," and that Plaintiff had done "some art work," and had obtained "art supplies" and "crafts" for Lawrence, and that Lawrence "knew these moneys was going to his address [sic]."[13] Plaintiff further stated that Lawrence had "a little stand - trying to get money but based on conversation that [k]new this money was going to this address [sic]."). Plaintiff did not explain these cryptic statements, even

---

[11]Hearing Transcript at pp. 5-7.
[12]At deposition Plaintiff indicated that he was born in 1980, Deposition at p. 9, while DOCCS records indicate that Lawrence, DIN #97-A-7376, was born in 1971. http://nysdoccslookup.doccs.ny.gov/GCA00P00/WIQ1/WINQ000
[13]Hearing Transcript at p. 5.

though Kling gave him the opportunity to do so.[14]

Kling then took testimony from McCarthy, who described his investigation, and explained how he had concluded that Plaintiff was responsible for the forgeries, based upon the similarity of the handwriting. McCarthy indicated that he could not identify the officers who had apparently verified the signatures on the forged disbursement forms, and Kling interjected that he had also unsuccessfully attempted to identify the signatures by showing them to "different officers" "in the block."[15] McCarthy acknowledged that it was facility policy for officers to verify inmates' identities when handing out mail and when taking disbursement forms, and stated that he "wouldn't be able to tell" how or why officers might have signed the forged forms. Lastly, McCarthy acknowledged that he was not a specialist in handwriting analysis.

Kling then reviewed with Plaintiff the additional items that Plaintiff had requested. Kling told Plaintiff that he did not have access to a handwriting expert, and therefore could not provide one. Kling further indicated that there was no DOCCS "directive" concerning forgery.[16] Kling reiterated that it was impossible to identify or take testimony from the officers who had signed the disbursement forms, since their signatures were illegible, and Plaintiff responded that even though they could not identify the officers, the fact that the officers had signed the forms indicated that no forgery had occurred.[17] Kling asked Plaintiff if he wanted to submit any further evidence, and Plaintiff essentially made a

---

[14]Hearing Transcript at pp. 6-7.
[15]Hearing Transcript at p. 8.
[16]Plaintiff responded that MacIntyre must have made a mistake in indicating that Plaintiff had requested such a directive, because he had asked MacIntyre for a directive concerning "timeliness," not forgery. Kling did not directly respond to that statement.
[17]Hearing Transcript at p. 11.

closing argument, indicating that he had a good disciplinary record, but had "got[ten] involved with the wrong guy [Lawrence] who got [him] in trouble."[18]   Again, Plaintiff did not explain what he meant by having "gotten involved" with Lawrence.   Kling asked Plaintiff if he had "any procedural objections [to] the way [he had conducted the hearing]," and Plaintiff responded, "Um, I can say that you [were] pretty much fair you can only do so much you know so – I already object  to it that is basically it [sic]."[19]

After a brief adjournment, Kling announced that he had found Plaintiff guilty of both forgery and stealing, noting the "compelling similarity" between Plaintiff's handwriting and the writing on the forged disbursement forms.[20]   Kling indicated that he credited McCarthy's testimony, and noted that Plaintiff had not offered a "credible defense."  Kling indicated that the officers' signatures on the forms did not disprove forgery, stating, "some officers may have been lax in verifying IDs."  Kling sentenced Plaintiff principally to six months in the Special Housing Unit ("SHU").   In that regard, Kling indicated that he considered the infraction to be severe from a security standpoint, particularly since the forgery and theft seemed to have precipitated dangerous retaliation, in the form of the arson to Plaintiff's cell.

---

[18]Hearing Transcript at p. 12.
[19]Hearing Transcript at p. 12.
[20]That Plaintiff knows "a few Chris Brinsons, and that his mother's name is Winifred Pike, are facts that came out during discovery in this action.  There is no indication that Kling was aware of them when he issued his decision.

Plaintiff appealed his conviction to Bradt, the facility superintendent.[21] Bradt issued a form denial of the appeal, which gave no explanation other than a boilerplate statement that, "After review, I find no reason to modify the disposition rendered."

Plaintiff next filed an appeal with defendant Albert Prack ("Prack"), Director of DOCCS's SHU/Inmate Disciplinary Program.[22] On December 6, 2012, Prack issued a form decision, denying the appeal, and explaining only that the hearing "ha[d] been reviewed and affirmed."

Plaintiff next filed an Article 78 Proceeding in New York State Supreme Court, Wyoming County, which was transferred to the New York State Supreme Court, Appellate Division Fourth Department. On March 21, 2014, the court issued a Memorandum and Order, reversing the disciplinary conviction. However, by that time, Plaintiff had already served his SHU sentence.

On May 1, 2014, Plaintiff commenced this action. In pertinent part the Amended Complaint contends that Plaintiff was innocent of the misbehavior charge, and that

---

[21]Curiously, the record contains *three* different versions of such appeal, which discrepancy is not explained as far as the Court is aware. More specifically, Exhibit H to the original Complaint in this action is a handwritten letter of appeal addressed to Bradt, asserting the following points: 1) Plaintiff's 14th Amendment rights were violated at the hearing; 2) the assistant (MacIntyre) failed to provide requested documents and did not identify the officers who countersigned the disbursement forms; 3) Kling failed to find out why Lawrence was unwilling to testify; and 4) the hearing did not comply with New York State regulations. A second version of this appeal is attached as Exhibit H to the Amended Complaint. This version is essentially similar to the aforementioned version, except that it is typed. Finally, Defendants have submitted a third version of the appeal, attached as Exhibit 14 to the Sheehan Affidavit [#82-6]. This version contains far less information than the versions submitted by Plaintiff; for example, this version does not expressly refer to any constitutional violation, nor does it detail any specific failings by either MacIntyre or Kling. Rather, this version merely indicates that the sentence imposed was "harsh" and "unjustified," and asks Bradt to "look into the matter." Incidentally, the version submitted by Defendants is the only version which is stamped as having been received by the Attica Superintendent's office. However, for purposes of the instant Decision and Order, the Court will assume that the most-detailed version of the appeal is the one that Plaintiff actually sent to Bradt.

[22]Docket No. [#82-6], Sheehan declaration, Ex. 16. This appeal specifically alleged that Plaintiff's "Fourteen[th] Amendment Constitutional Rights" had been violated, and essentially listed all of the aforementioned actions by McCarthy, MacIntyre and Kling. For example, the appeal asserted that McCarthy had failed to conduct a proper investigation, that MacIntyre had failed to help Plaintiff prepare for the hearing, and that Kling had failed to conduct a proper hearing.

Defendants violated his due process rights under the Fourteenth Amendment to the U.S. Constitution, by falsely charging and convicting him of the infractions. On October 5, 2015, Plaintiff filed the subject motion for summary judgment [#80], and on November 16, 2015, Defendants filed the subject cross-motion for summary judgment [#82]. On December 16, 2015, Plaintiff filed a response [#84],[23] and on January 29, 2016, Defendants filed a reply [#85].

## DISCUSSION

Plaintiff's *Pro Se* Status

Since Plaintiff is proceeding *pro se*, the Court has construed his submissions liberally, "to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir.1994).

*Rule 56*

The parties have moved for summary judgment pursuant to Fed. R. Civ. P. 56. Summary judgment may not be granted unless "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). "[T]he movant must make a prima facie showing that the standard for obtaining summary judgment has been satisfied." 11 Moore's Federal Practice, § 56.11[1][a] (Matthew Bender 3d ed.). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial,

---

[23]Plaintiff asserts, in pertinent part, that Defendants' counsel "forged" their signatures on their affidavits, and that their sworn statements are not evidence. *See*, Jarvis Declaration [#84].

the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." *Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir.1996) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)), *cert denied*, 517 U.S. 1190 (1996).

The burden then shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To do this, the non-moving party must present evidence sufficient to support a jury verdict in its favor. *Anderson*, 477 U.S. at 249. The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993).

<u>Section 1983</u>

Plaintiff is suing pursuant to 42 U.S.C. § 1983, and the legal principles generally applicable to such claims are well settled:

> In order to establish individual liability under § 1983, a plaintiff must show (a) that the defendant is a "person" acting "under the color of state law," and (b) that the defendant caused the plaintiff to be deprived of a federal right. See, *e.g., Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). Additionally, "[i]n this Circuit personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir.1977).
> \*\*\*
> An individual cannot be held liable for damages under § 1983 "merely because he held a high position of authority," but can be held liable if he was personally involved in the alleged deprivation. *See Black v. Coughlin*,

76 F.3d 72, 74 (2d Cir.1996). Personal involvement can be shown by: evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference ... by failing to act on information indicating that unconstitutional acts were occurring. *See Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir.1995).

*Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 122, 127 (2d Cir. 2004).

<u>14th Amendment Procedural Due Process in Prison Disciplinary Hearings</u>

Plaintiff contends that Defendants violated his 14th Amendment procedural due process rights. In general, "[t]o prevail on a section 1983 due process claim arising out of a disciplinary hearing, a plaintiff must show that he both (1) possessed an actual liberty interest and (2) was deprived of that interest without being afforded sufficient process." *Liao v. Malik*, No. 913CV1497GTSDEP, 2016 WL 1128245, at *4 (N.D.N.Y. Feb. 26, 2016) (citations omitted), report and recommendation adopted, No. 913CV1497GTSDEP, 2016 WL 1122069 (N.D.N.Y. Mar. 22, 2016). Here, Defendants do not dispute that Plaintiff possessed a liberty interest in avoiding confinement in the SHU for six months.

Instead, Defendants contend that Plaintiff received due process. The legal principles on this point are clear:

The procedural safeguards to which a prison inmate is entitled before being deprived of a constitutionally cognizable liberty interest are well established under *Wolff v. McDonnell*, 418 U.S. 539 (1974). In its decision in *Wolff*, the Court held that the constitutionally mandated due process requirements include (1) written notice of the charges to the inmate; (2) the opportunity to appear at a disciplinary hearing and a reasonable opportunity to present witnesses and evidence in support of his defense, subject to a prison

facility's legitimate safety and penological concerns; (3) a written statement by the hearing officer explaining his decision and the reasons for the action being taken; and (4) in some circumstances, the right to assistance in preparing a defense. *Wolff*, 418 U.S. at 564–69; *see also Luna v. Pico*, 356 F.3d 481, 487 (2d Cir. 2004). To pass muster under the Fourteenth Amendment, it is also required that a hearing officer's disciplinary determination garners the support of at least "some evidence." *Superintendent, Mass. Corr. Inst., Walpole v. Hill*, 472 U.S. 445, 455 (1985); *Luna*, 356 F.3d at 487–88.

*Liao v. Malik*, 2016 WL 1128245 at * 5. "In addition, to establish a procedural due process claim in connection with a prison disciplinary hearing, an inmate must show that he was prejudiced by the alleged procedural errors, in the sense that the errors affected the outcome of the hearing." *Eleby v. Selsky*, 682 F. Supp. 2d 289, 292 (W.D.N.Y. 2010) (*citing Powell v. Coughlin*, 953 F.2d 744, 750 (2d Cir. 1991) and *Clark v. Dannheim*, 590 F.Supp.2d 426, 429-31 (W.D.N.Y. 2008)).

Where, as in the instant case, the inmate is entitled to assistance in preparing a defense, the failure to provide it may violate the 14th Amendment. Such assistance

should include gathering evidence, obtaining documents and relevant tapes, and interviewing witnesses. At a minimum, an assistant should perform the investigatory tasks which the inmate, were he able, could perform for himself.

*Eng v. Coughlin*, 858 F.2d 889, 898 (2d Cir. 1988). However,

[t]he scope of the assistance that must be provided to an accused inmate, as contemplated under *Wolff* and *Eng*, is not unlimited, and clearly does not require the assignment of counsel or of the functional equivalent of a private investigator. The assigned assistant is required only to perform those functions that the plaintiff would have, had he not been hampered through SHU confinement, and need not go beyond the inmate's instructions. [Again, though,] any claim of deprivation of assistance is reviewed for

harmless error.

*Liao v. Malik*, 2016 WL 1128245, at *6 (citations omitted).

<u>The Alleged Violations</u>

Here Plaintiff has sued five defendants: McCarthy, MacIntyre, Kling, Bradt and Prack. However, the § 1983 claims against McCarthy, Bradt and Prack are not actionable unless Plaintiff actually suffered a due process violation as a result of the actions or omissions of MacIntyre and/or Kling. In that regard, the Amended Complaint contends that McCarthy violated Plaintiff's rights by conducting a deficient investigation and then filing a misbehavior report that was false. Plaintiff maintains that McCarthy conducted a shoddy investigation, which resulted in him filing a "false" misbehavior report.[24]

A prison inmate generally has no constitutional right to avoid having a false misbehavior report filed against him. *Willey v. Kirkpatrick*, 801 F.3d 51, 63 (2d Cir. 2015) ("[A] prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest.") (citation omitted). However, there are at least

> two exceptions to this rule: when an inmate is able to show either (1) that he was disciplined without adequate due process as a result of the report; or (2) that the report was issued in retaliation for exercising a constitutionally protected right.

*Id.* (citations and internal quotation marks); *see also, Williams v. Dubray*, 557 F. App'x 84,

---

[24]Plaintiff also contends that McCarthy's misbehavior report did not comply with procedural requirements imposed by New York State regulations. However, it is well settled that violation of such procedures does not amount to a federal due process violation. *See, Holcomb v. Lykens*, 337 F.3d 217, 224 (2d Cir. 2003) ("Although state laws may in certain circumstances create a constitutionally protected entitlement to substantive liberty interests, *see, e.g., Sandin v. Conner*, 515 U.S. 472, 483-84, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995); *Tracy v. Salamack*, 572 F.2d 393, 396 & n. 9 (2d Cir.1978) (per curiam), state statutes do not create federally protected due process entitlements to specific state-mandated procedures.").

87 (2d Cir. Feb. 26, 2014) ("[T]he inmate must show *something more, such as* that he was deprived of due process during the resulting disciplinary hearing, or that the misbehavior report was filed in retaliation for the inmate's exercise of his constitutional rights.") (emphasis added).

Here, there is no evidence that McCarthy issued the misbehavior report in retaliation for Plaintiff's exercise of a constitutionally protected right. Plaintiff does not contend that McCarthy had any personal animus toward him in that regard, and indeed, Plaintiff acknowledges that he and McCarthy had no interaction prior to this incident.[25] Consequently, Plaintiff's claim against McCarthy is only actionable if he was deprived of due process at the hearing, that is, if he was deprived of due process by MacIntyre and/or Kling.

Similarly, Plaintiff's claims against Bradt and Prack are premised on the theory that they failed to train and supervise Kling and/or failed to correct constitutional violations committed by MacIntyre and Kling, after being notified of them by Plaintiff.[26] Accordingly, Plaintiff's claims against Bradt and Prack are only actionable if he was first deprived of due process by MacIntyre and/or Kling. As discussed below, however, the Court finds as a matter of law that neither MacIntyre nor Kling violated Plaintiff's federal due process rights.

### MacIntyre Did Not Commit A Due Process Violation

Plaintiff contends that MacIntyre failed to provide assistance, and violated his due process rights, in the following ways: 1) he did not ascertain  why Lawrence was unwilling

---

[25]Pl. Dep. at p. 21.
[26]Amended Complaint at ¶ ¶ 11, 12.

to testify at the hearing; 2) he did not investigate the identities of the officers who had countersigned the seven forged disbursement forms; 3) he did not provide Plaintiff with copies of the forged disbursement forms, but rather, told Plaintiff that he could get them at the hearing; 4) he did not arrange for a handwriting expert to testify; and 5) he did not provide Plaintiff with copies of "Chapter V" or the directive on forgery. The Court will examine each of these claims in turn.

At the outset, the Court notes that to the extent that MacIntyre failed to do what Plaintiff asked, there is no indication that he did so maliciously or in bad faith. *See, Silva v. Casey*, 992 F.2d 20, 22 (2d Cir. 1993) (Assistant's failure to provide assistance purposefully or in bad faith may raise constitutional issue). For example, Plaintiff does not suggest that he had any prior negative interactions with MacIntyre, or that their interactions were contentious.

Further, the Court does not agree that MacIntyre violated Plaintiff's rights by failing to ascertain exactly why Lawrence was unwilling to testify. In that regard, the record indicates that on September 13, 2012, Lawrence indicated his unwillingness to testify, by signing a "refusal to testify" form, witnessed by MacIntyre. MacIntyre reported on the form, "does not want to testify." Plaintiff maintains that MacIntyre had a duty to elicit a further explanation from Lawrence. (Plaintiff does not dispute that Lawrence actually refused to testify). However, on the present record, which gives no indication that anyone was pressuring Lawrence not to testify, the Court disagrees. *See, Sowell v. Bullis*, No. 913CV1482GLSDJS, 2016 WL 1696454, at *10 (N.D.N.Y. Mar. 25, 2016) ("Courts in the Second Circuit have indicated that where a witness indicates their refusal to testify, hearing officers are not obligated to inquire into the reason for such refusal unless there

is evidence of intimidation by prison officials.") (collecting cases), report and recommendation adopted, No. 913CV1482GLSDJS, 2016 WL 1700410 (N.D.N.Y. Apr. 27, 2016).

Nor does the Court agree that MacIntyre had an obligation to figure out the identities of the officers who countersigned the seven forged disbursement forms. In that regard, although Plaintiff admits that the signatures on the forms are illegible, he contends that MacIntyre should have gained access to the facility's log books, checked the entries for the dates on which the forms were countersigned, and then checked with the officers who were working those days in the relevant areas of the prison, to see whether they recognized the signatures. MacIntyre denies that Plaintiff asked him to ascertain the identities of the officers, or to interview them. Rather, MacIntyre indicates that Plaintiff merely asked him to arrange to have the officers at the hearing, and that he related that request to hearing officer Kling, who was responsible for arranging for staff to testify. MacIntyre's version of events is supported by the assistance form, which Plaintiff signed, and which states that Plaintiff requested to have "officers who signed the disbur. forms present @ hearing."[27]

However, crediting Plaintiff's version of events, as the Court must, it nevertheless finds that MacIntyre did not commit a constitutional violation, even assuming that Plaintiff specifically requested him to identify and interview the officers who had signed the disbursement forms. In that regard, it is undisputed that the officers' signatures and initials on the disbursement forms are illegible, and that the officers' identifies are

---

[27]MacIntyre Aff., Ex. A.

therefore not readily ascertainable. Indeed, Plaintiff contends that in order to discover the officers' identities, it would have been necessary to check the security staff's "log books" for the seven dates in question (a period spanning two months)[28] to ascertain which officers were working, and to then check with those officers to see if they could identify the signatures and initials. However, that type of investigation goes beyond what is required of a hearing assistant, because it is not something that Plaintiff could have done for himself. *See, Silva v. Casey*, 992 F.2d at 22 (When circumstances require it, "an assistant must be assigned to the inmate to act as his *surrogate*-to do what the inmate would have done were he able.") (emphasis in original). On this point, it cannot be plausibly maintained that facility rules would have permitted Plaintiff, an inmate, to inspect the corrections officers' log books in order to prepare for his hearing. However, even if that were possible, a hearing assistant is not "the functional equivalent of a private investigator," *Liao v. Malik*, 2016 WL 1128245, at *6, and the Court believes that the investigatory procedures, which Plaintiff maintains MacIntyre should have followed, would have been unduly burdensome. And finally, MacIntyre's failure to conduct an investigation into the officers' identities was mitigated by Kling's attempt to identify the officers, even though, as discussed below, Kling had no duty to do so.

Additionally, the Court finds that MacIntyre did not violate Plaintiff's due process rights by failing to provide copies of the forged disbursement forms, and instead telling Plaintiff that he could get them at the hearing. MacIntyre denies that Plaintiff asked him to provide copies of the forged disbursements, and, again, this version of events is

---

[28]The dates of the forged disbursement forms are: July 3, 2012, August 2, 2012, August 7, 2012, August 9, 2012, August 17, 2012, August 20, 2012 and August 24, 2012.

supported by the "assistant form," which Plaintiff signed.[29]  Nevertheless, the Court must assume that Plaintiff asked MacIntyre for the documents.

Assuming *arguendo* that MacIntyre failed to obtain copies of the forged disbursement forms as requested, such failure was harmless error, because Plaintiff was able to view, if not hold, the documents at the hearing.[30]  Even more significantly, Plaintiff has not shown how the outcome of the hearing might have been different if he had possessed actual copies of the forged documents beforehand.[31]  On this point, Plaintiff's defense was simply that he had nothing to do with forging the forms.  Plaintiff did not argue then, nor does he argue now, that the handwriting on the forms is not *in fact similar* to his own handwriting.[32]  Rather, Plaintiff vaguely contends that if he had possessed the forged forms prior to the hearing, he might have been able to ask "more question[s]," or might have been able to figure out the identities of the officers who signed the forms.[33]  However, Plaintiff does not indicate what questions he would have asked, nor has he ever been able to identify any officer from the signatures, despite having been provided copies of the disbursement forms during the Article 78 proceeding.  Accordingly, any error by MacIntyre in this regard was harmless.  For all of these reasons, MacIntyre's failure to

---

[29]MacIntyre Aff., Ex. A.
[30]Pl. Dep. at pp. 48-49, 62.  At the deposition, Plaintiff indicated that Kling had not really allowed him to have a clear look at the documents.  However, the hearing transcript indicates that Plaintiff had viewed the forged forms.  For example, Plaintiff commented on the fact that some of the officers' signatures had a stamp over them. Hearing Transcript at p. 10; *see also, id.* at p. 11 (Plaintiff commented that all of the evidence was "in front of [him]."); *see also, id.* (Kling stated, without objection, that "we have gone over the misbehavior report [and] the disbursement forms[.]").
[31]At his deposition, Plaintiff speculated that if he'd had the forged forms, he might have recognized the countersigning officers' signatures or initials. Pl. Dep. at p. 46.  However, Plaintiff has now had the documents in his possession for quite awhile, and has not offered any opinion as to the identities of the officers.
[32]Plaintiff implicitly acknowledged the similarities when he speculated, at the hearing, that Lawrence might have attempted to frame him by "ma[king] it look like [his] hand writing." Hearing transcript at p. 6.
[33]Deposition Transcript at pp. 43, 46.

provide Plaintiff with copies of the forged disbursement forms did not deprive Plaintiff of due process.

Additionally, MacIntyre did not deprive Plaintiff of due process by failing to arrange for a handwriting expert to testify at the hearing. In that regard, the record indicates that MacIntyre failed to provide a "handwriting specialist," after Plaintiff requested one.[34] However, MacIntyre was not required to do what Plaintiff would not have been able to do for himself if he was not in keeplock. Plaintiff has neither alleged nor shown that there was such an expert available for MacIntyre to produce at the hearing. Rather, as discussed further below, it is undisputed that no such expert was available to either MacIntyre or Kling. MacIntyre was not required to act as Plaintiff's attorney or as a private investigator. MacIntyre's failure to arrange for the testimony of a handwriting expert does not amount to a constitutional violation.

Finally, MacIntyre did not violate Plaintiff's constitutional rights by failing to provide him with copies of "Chapter V" or the directive on forgery. To begin with, Plaintiff testified at the hearing that he never asked MacIntyre for a directive on forgery, though he now claims that he did.[35] However, even assuming that Plaintiff asked MacIntyre for the DOCCS directive on forgery, Defendants contend that no such directive exists, and Plaintiff has not shown otherwise. As for whether MacIntyre failed to provide Plaintiff with a copy of 7 NYCRR, Chapter V, Plaintiff contends that he wanted the information so that he could understand, generally, how disciplinary hearings were run, even though he

---

[34]Sheehan Decl. Ex. B (Deposition exhibit 5).
[35]Hearing transcript at p. 11 ("He [MacIntyre] wrote down the wrong thing. I said [that I wanted] the directive on the timeliness of the misbehavior report when it is served. I don't know why he put [that I asked him for the directive on] forgery so that is he misprinted the wrong thing.").

admits that he had already been through multiple disciplinary hearings.[36]  MacIntyre indicates that Plaintiff never asked him to provide Chapter V, and, again, such request is *not* set forth on the assistant form that Plaintiff signed.  Nevertheless, assuming, as the Court must, that Plaintiff actually made such a request, MacIntyre's failure to provide Chapter V was harmless error, since Plaintiff has not shown how the outcome of the disciplinary hearing would have been any different if he had been given the information.

The Court is aware that in *Eng v. Coughlin*, the Second Circuit indicated that "an assigned assistant who does *nothing*" to assist a prisoner "has failed to accord the prisoner his limited constitutional due process right of assistance." *Id.*, 858 F.2d at 898 (emphasis added).  Here, MacIntyre admittedly did very little for Plaintiff, apart from notifying him that Lawrence was unwilling to testify.  However, insofar as MacIntyre failed to provide further assistance, no constitutional violation occurred, either because what Plaintiff had requested was unavailable, or because the failure was harmless error. Accordingly, MacIntyre is entitled to summary judgment on the § 1983 claim.

<u>Kling Did Not Commit A Due Process Violation</u>

As mentioned earlier, in the context of a prison disciplinary hearing, due process requires a written statement by the hearing officer explaining his decision and the reasons for the action being taken, which must be supported by at least "some evidence." *Liao v. Malik*, 2016 WL 1128245 at * 5.  Plaintiff contends that Kling's decision is deficient in this regard, since it is based on the opinion of McCarthy, who was not trained in handwriting analysis.  However, the "some evidence" standard may be satisfied where a hearing

---

[36]Deposition transcript at p. 44.

officer relies on a corrections officer's testimony concerning the similarity of handwriting samples. *Lewis v. Johnson*, No. 9:08-CV-482 TJM/ATB, 2010 WL 3785771, at *11 (N.D.N.Y. Aug. 5, 2010) (collecting cases), report and recommendation adopted, No. 08-CV-0482, 2010 WL 3762016 (N.D.N.Y. Sept. 20, 2010); *Woodard v. Shanley*, No. 10-CV-1121 DNH/DRH, 2011 WL 6845772, at *4, 5 (N.D.N.Y. Dec. 7, 2011) (collecting cases), report and recommendation adopted, No. 9:10-CV-1121, 2011 WL 6845771 (N.D.N.Y. Dec. 29, 2011), *aff'd*, 505 F. App'x 55 (2d Cir. 2012).

Moreover, Kling did not rely solely on McCarthy's testimony, but rather, he indicated his own finding of a "compelling similarity" between Plaintiff's handwriting and the writing on the forged disbursement forms. This finding is supported by reliable evidence, as there clearly are striking similarities between the handwriting on Plaintiff's disbursement form and the writing on the forged forms.[37]

Liberally construing Plaintiff's papers, the Court further understands him to allege that Kling's decision did not adequately explain how he could have submitted the forged disbursement forms for payment, since the forms were required to be countersigned by corrections officers, who were responsible for verifying the inmate's identity. However, the Court again disagrees. Kling stated that the officers who signed the forms "may have been "lax in verifying I.D.," and that conclusion seems reasonable given the compelling similarity between Plaintiff's handwriting and the handwriting on the forged disbursement forms. In other words, it is reasonable to believe that the officers must have been lax, since there was strong evidence that Plaintiff in fact committed the forgery. The Court

---

[37] *See*, Kling Aff., Ex. A, Deposition Ex. 8 (D000010) & Deposition Ex. 10 (D000015, D000019-24).

would further note that such laxity by the officers in "verifying I.D." is also suggested by the fact that the officers signed the forms even though Lawrence's name was clearly misspelled on them. Accordingly, Plaintiff's contention, that Kling's decision is unsupported by sufficient evidence, lacks merit.

Plaintiff further contends that Kling failed to adequately explore why Lawrence was unwilling to testify. However, a hearing officer has no authority to compel a witness to testify. *See, Silva v. Casey*, 992 F.2d 20, 21-22 (2d Cir. 1993) Nor does a hearing officer have a general duty to evaluate a witness's reason for declining to testify. *See, Smith v. Prack*, No. 9:12-CV-1474 GTS/DEP, 2015 WL 5512951, at *7 (N.D.N.Y. Sept. 14, 2015) ("[A] hearing officer is under no obligation to make an independent evaluation of the basis for the refusal to testify.") (citations and internal quotation marks omitted), *aff'd sub nom. Smith v. Graham*, No. 15-3414, 2017 WL 1103467 (2d Cir. Mar. 22, 2017). Moreover, a hearing officer is entitled to rely upon a "refusal form" prepared by someone else when deciding whether it would be futile to attempt to have a witness testify. *See, Jamison v. Fischer*, No. 14–805–pr, 617 F.App'x 25, 27 (2d Cir. Jun. 30, 2015) (Stating, as part of a discussion on qualified immunity, that a hearing officer may reasonably conclude that it would be futile to attempt to have a witness testify, based upon a "refusal form" completed by a corrections officer).

Plaintiff also maintains that Kling did not make a sufficient effort to identify the officers who countersigned the disbursement forms. However, it is undisputed that Kling attempted to learn the officers' identities, by showing the disbursement forms to other officers. Although Kling was ultimately not able to identify the officers, such failure does not amount to a due process violation. *See, Dixon v. Goord*, 224 F. Supp. 2d 739, 746

(S.D.N.Y. 2002) ("[Hearing Officer] Schneider's failure to call a witness identified by Dixon only as "Latino" did not violate Dixon's due process rights. . . .  Schneider has given a logical reason for not providing the witness requested by Dixon, namely that he could not identify the officer based on Dixon's description."); *see also, Williams v. Wright*, No. 93 CIV. 0207 (KTD), 1995 WL 225640, at *3 (S.D.N.Y. Apr. 17, 1995)  ("The fact that Plaintiff was denied the opportunity to call witnesses whom he could not or would not name does not constitute a constitutional violation.").  Although Plaintiff contends that Kling should have gone further, and examined the facility log books, his failure to do so did not violate due process.

Plaintiff further contends that Kling should have taken testimony from a handwriting analysis expert. Kling denied Plaintiff's request for such an expert, stating, "We don't have access to that so I am going to deny that [request]."[38]  The Court is not aware of any authority giving an inmate an absolute procedural due process right to call witnesses from outside of the prison to testify in a prison disciplinary hearing.  Rather, it is clear that an inmate's ability to call witnesses at a prison disciplinary hearing is "subject to the mutual accommodation between institutional needs and objectives and the provisions of the Constitution." *Ponte v. Real*, 471 U.S. 491, 495, 105 S.Ct. 2192, 2195 (1985) (citation and internal quotation marks omitted).  "[P]rison officials may be required to explain, in a limited manner, the reason why witnesses were not allowed to testify, . . . but so long as the reasons are logically related to preventing undue hazards to 'institutional safety or correctional goals,' the explanation should meet the due process requirements as outlined

---

[38]Hearing Transcript at p. 10.

in *Wolff.*" *Ponte v Real*, 471 U.S. at 497, 105 S.Ct. at 2196.

Moreover, an inmate has no "due process right to have the prison find, retain, and present an expert witness on the prisoner's behalf." *Garrett v. Smith*, 180 F. App'x 379, 381 (3d Cir. 2006) (agreeing with the decision of the 8th Circuit, in *Spence v. Farrier*, 807 F.2d 753, 755-56 (8th Cir. 1986), in which the court stated that, "To allow prisoners to present expert testimony in regard to [drug testing] reliability would seriously interfere with the institutional goal of drug deterrence and prompt resolution of drug related infractions."); *see also, Mackley v. Napel*, No. 2:14-CV-46, 2014 WL 4700229, at *4 (W.D. Mich. Sept. 19, 2014) ("Due process also does not require prison officials to find and retain an expert in handwriting analysis.") (citing *Spence v. Farrier* and *Garrett v. Smith*). Accordingly, Kling did not violate due process by failing to have a handwriting expert testify at the hearing.

Plaintiff further contends that Kling violated due process by failing to provide him with personal copies of the forged disbursements and 7 NYCRR "Chapter V." "Due process considerations entitle an inmate to view evidence critical to his guilt or innocence of disciplinary charges." *Carlson v. Parry*, No. 06-CV-6621P, 2012 WL 1067866, at *12 (W.D.N.Y. Mar. 29, 2012). However, due process does not always require that an inmate be provided with copies of the evidence against him. *See, Monserrate v. New York State Senate*, 599 F.3d 148, 159-160 (2d Cir. 2010) (Appellant received adequate process, despite his complaint that he was not "given copies of the materials considered" at the hearing). Moreover, for the reasons already discussed, any error in that regard was harmless.

Finally, Plaintiff now asserts that Kling was biased, even though he stated at the hearing that Kling was "pretty much fair."

> Due process requires that prison disciplinary hearings be conducted by a fair and impartial hearing officer. However, prison adjudicators are presumed to be unbiased and the degree of impartiality required of prison officials does not rise to the level of that required of judges generally. Because of the special characteristics of the prison environment, it is permissible for the impartiality of such officials to be encumbered by various conflicts of interest that, in other contexts, would be adjudged of sufficient magnitude to violate due process.

*Shabazz v. Bezio*, 669 F. App'x 592, 593 (2d Cir. 2016) (citations and internal quotation marks omitted).

As evidence of Kling's bias, the Amended Complaint alleges that Kling "chose to use deception during the hearing and make it appear that he gave Plaintiff the disbursement forms and checks for review."[39] Apparently, Plaintiff is referring to Kling's comment during the hearing that he "went through the evidence" with Plaintiff.[40] However, Kling never stated that he had handed the documents to Plaintiff. Rather, as the Court has already discussed, Kling showed the disbursement forms and other documents to Plaintiff, but did not allow him to hold them in his hands. Accordingly, the Court cannot see how Kling "used deception." Plaintiff also now claims that he "d[id]n't really know what [he was] looking at because there[ was] so much paperwork being placed in [his] face."[41] However, Plaintiff never alerted Kling to this problem during the hearing, therefore, such fact, even if true, does not call Kling's impartiality into question.

---

[39]Amended Complaint at p. 15.
[40]Hearing Transcript at p. 5.
[41]Pl. Deposition at p. 48.

In sum, Plaintiff has not raised a triable issue of fact as to whether Kling was biased against him.

For all of the foregoing reasons, Plaintiff cannot establish a federal due process violation against any of the Defendants.

<u>Plaintiff's State Law Claims Are Barred by New York Correction Law § 24</u>

The Amended Complaint [#41] also purports to assert state-law claims against the Defendants, for "excessive wrongful confinement." Plaintiff has sued all of the Defendants in their individual capacities. Defendants maintain that such claims are barred by New York Corrections Law § 24, which "bars federal suit on state-law claims against officers in their individual or personal capacities." *Gill v. Tuttle*, 93 F. App'x 301, 302 (2d Cir. 2004) (*citing Baker v. Coughlin*, 77 F.3d 12, 14-15 (2d Cir.1996)). In particular, "a federal court is without jurisdiction over such a claim. Under New York State Corrections Law § 24, tort claims against prison officials can only be brought in the Court of Claims for the State of New York." *Parker v. Miller*, 199 F.3d 1323 (table), 1999 WL 1024108 at *2 (2d Cir. Oct. 27, 1999).

Plaintiff responds that Correction Law § 24 is inapplicable here, because Defendants were acting outside the scope of their employment. On this point, Corrections Law § 24 expressly pertains to lawsuits "arising out of any act done or the failure to perform any act within the scope of the employment and in the discharge of the duties by such officer or employee." However, such argument lacks merit, as Plaintiff cannot point to any evidence indicating that Defendants were acting outside the scope of their employment. Rather, Plaintiff just baldly asserts that MacIntyre and Kling were "not doing

[their] employers' work,"[42] which is insufficient to raise a triable issue of fact. Accordingly, the Court lacks jurisdiction over the state-law claims. *See, Parker v. Miller*, 1999 WL 1024108 at *2 ("Because Plaintiffs have failed to advance any claim that the officials in this case acted beyond their authority, this Court is without jurisdiction over Plaintiffs' wrongful death claim.").

## CONCLUSION

Plaintiff's motion for summary judgment [#80] is denied and Defendants' cross-motion for summary judgment [#82] is granted in part, with respect to the federal claims under 42 U.S.C. § 1983, which are dismissed with prejudice. The state law claims are dismissed without prejudice pursuant to Correction Law § 24. The Clerk of the Court is directed to close this action. The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good faith, and leave to appeal to the Court of Appeals as a poor person is denied. *Coppedge v. United States*, 369 U.S. 438 (1962). Further requests to proceed on appeal as a poor person should be directed, on motion, to the United States Court of Appeals for the Second Circuit, in accordance with Rule 24 of the Federal Rules of Appellate Procedure.

So Ordered.

Dated:      Rochester, New York
           June 23, 2017
                        ENTER:


                        /s/ Charles J. Siragusa
                        CHARLES J. SIRAGUSA
                        United States District Judge

---

[42]Pl. Response [#84], Memo of Law at p. 16.